UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JOFAZ TRANSPORTATION, INC. and
Y&M TRANSPORT CORP.,

                                 Plaintiffs,             **OPINION & ORDER**

      - against -                       No. 22-CV-3455 (CS)

LOCAL 854 PENSION FUND,

                                   Defendant.
---------------------------------------------------------------x

<u>Appearances</u>:

Jennifer S. Smith
Law Offices of Jennifer Smith PLLC
New York, New York
*Counsel for Plaintiffs*

Joseph E. Clark
Sydney L. Juliano
Proskauer Rose LLP
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

      Before the Court is the motion of Plaintiffs Jofaz Transportation, Inc. and Y&M

Transport Corp. (collectively, "Plaintiffs" or "Jofaz"), (ECF No. 36), for an order (1) entering

judgment on the Court's April 26, 2024 Order, (ECF No. 32 (the "Jofaz Order")), that adopted

and applied to this case the March 22, 2024 opinion and order in the related case *Mar-Can*

*Transp. Co., Inc. v. Loc. 854 Pension Fund*, No. 20-CV-8743, 2024 WL 1250716, at *1

(S.D.N.Y. Mar. 22, 2024) (the "*Mar-Can* Decision")), (2) directing Defendant Local 854

Pension Fund ("Defendant" or the "Old Plan") to produce an accounting of Jofaz's withdrawal

liability overpayment, with interest (the "Judgment Amount"), and (3) requiring Defendant to pay the Judgment Amount.

I.    **BACKGROUND**

I assume the parties' familiarity with the record, and with the *Mar-Can* Decision, and therefore only briefly summarize the background and procedural history leading up to this motion.  The Complaint alleges the following facts, which are not disputed unless otherwise noted:  Defendant Old Plan is a multi-employer defined benefit pension plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq.*[1] (*See* ECF No. 1 ("Compl.") ¶¶ 18-19.)  Before July 30, 2021, Jofaz participated in the Old Plan through a collective bargaining agreement ("CBA") with the International Brotherhood of Teamsters Local 553 (the "Old Union"), (*id.* ¶¶ 21, 30-31), which required Jofaz to contribute to the Old Plan for employees who performed work covered by that CBA, (*id.* ¶ 31).  On or about July 30, 2021, the National Labor Relations Board ("NLRB") certified the results of Jofaz's employees' election to leave the Old Union and join Local 854 of the Amalgamated Transit Workers ("ATW") Union.  (*Id.* ¶ 33; *see id.* ¶ 22.)  This change of the employees' collective bargaining representative triggered Jofaz's involuntary complete withdrawal from the Old Plan.  (*See id.* ¶¶ 34-35, 40.)  On September 9, 2021, the Old Plan notified Jofaz about its withdrawal under ERISA's relevant notice provisions, assessed Jofaz's withdrawal liability to the Old Plan as $3,147,109, plus interest, and demanded payment of that withdrawal liability in 10 quarterly installments:  nine payments of $341,319 and one payment of $201,540, plus interest, (*id.* ¶¶ 40-42).  Jofaz has made all of those required payments.  (*See* ECF No. 36-1 ¶¶ 19-20; ECF No. 39 ¶ 9; *see also* ECF No. 37 ("Jofaz's Mem.") at 4-5; ECF No. 38 ("Old Plan's Opp.") at 4.)

---

[1] The Court refers to ERISA sections by their numbering in Title 29 of the U.S. Code.

Around October 22, 2021, pursuant to 29 U.S.C. § 1415(b), Jofaz advised the Old Plan

that Jofaz's employees would participate in the ATW Fund (the "New Plan")[2] because of the

certified change in their collective bargaining representative and requested the Old Plan to

initiate the corresponding pension transfer. (Compl. ¶ 44.) The Old Plan refused to do so. (*Id.* ¶

45.) Around December 3, 2021, Jofaz requested that the Old Plan review its assessment of

Jofaz's withdrawal liability and again advised the Old Plan of its obligation to transfer pension

assets and liabilities to the ATW Fund in accordance with 29 U.S.C. § 1415. (*Id.* ¶¶ 46-47.)

Jofaz also advised the Old Plan of its obligation to reduce Jofaz's assessed withdrawal liability

pursuant to 29 U.S.C. §§ 1415(c) and 1391(e). (*Id.* ¶¶ 48-49.) Around March 3, 2022, the Old

Plan responded to Jofaz's request for review, refusing to initiate the pension transfer or to

recalculate Jofaz's withdrawal liability. (*Id.* ¶¶ 50-51.)[3] Nor has it reduced Jofaz's withdrawal

liability. (*Id.* ¶ 58.)[4]

On April 28, 2022, Jofaz commenced this lawsuit, asserting that: (1) under 29 U.S.C.

§ 1415(b) the Old Plan must initiate the process of transferring pension assets and liabilities to

the New Plan, (2) the Old Plan must reduce Jofaz's employer withdrawal liability under 28

U.S.C § 1415(c), estimate that reduction under 29 U.S.C. § 1391(e), and adjust the payment

schedule accordingly; (3) the Old Plan is required to execute the transfer of pension assets and

---

[2] The ATW Fund is a multiemployer defined benefit pension plan. (Compl. ¶¶ 23-25.)

[3] In its Answer, (ECF No. 15), the Old Plan purported to deny the allegations regarding the correspondence from October 22, 2021 through March 3, 2022, but it admitted that the documents referenced in the respective paragraphs of the Complaint "speak for [themselves] and [are] the best evidence of [their] own content," (*see id.* ¶¶ 44-51).

[4] The Old Plan stated in its Answer that it lacked the information necessary to calculate the amount of pension assets and liabilities to be transferred to the New Plan because Jofaz did not provide this information when requested. (Answer ¶ 51.) That issue has apparently been resolved, as Jofaz represents in its reply brief that the Old Plan executed the § 1415 transfer on or about May 19, 2023. (*See* ECF No. 41 ("Jofaz's Reply") at 9.)

liabilities to the New Plan under 29 U.S.C. § 1415; and (4) the Old Plan must reduce Jofaz's withdrawal liability to the Old Plan by an amount equal to the excess of unfunded vested benefits transferred to the New Plan.  (*See* Compl. ¶¶ 64-95.)  On June 28, 2022, the Old Plan filed its Answer, (ECF No. 15), and on August 15, 2022, then-Magistrate Judge Paul Davison so-ordered a discovery plan, (ECF No. 21).  On August 4, 2023, the parties requested a formal stay of proceedings pending this Court's resolution of summary judgment motions then pending in the related *Mar-Can* case, in light of the "similar legal and factual issues" in both cases.  (ECF No. 26.)  That same day, Magistrate Judge Victoria Reznik granted the parties' application and stayed discovery deadlines pending the resolution of the summary judgment motions in *Mar-Can*.  (ECF No. 27.)

On March 22, 2024, I issued an opinion and order in *Mar-Can* that disposed of the parties' motions for summary judgment and resolved the outstanding legal issue regarding the interpretation and application of 29 U.S.C. § 1415(c), and on April 26, 2024, after conferring with the parties, (*see* Minute Entry dated April 26, 2024), I ordered that the *Mar-Can* Decision applies in this case, (*see* Jofaz Order (attaching *Mar-Can Transp. Co., Inc. v. Loc. 854 Pension Fund*, No. 20-CV-8743 ECF No. 249, 2024 WL 1250716 (S.D.N.Y. Mar. 22, 2024))).  The instant motion followed.

## II.    DISCUSSION

### A.    Entry of Judgment and Accounting

Under Federal Rule of Civil Procedure ("FRCP") 58(a), "[e]very judgment . . . must be set out in a separate document," subject to certain exceptions not relevant here.  Fed. R. Civ. P. 58(a).  "A party may request that judgment be set out in a separate document as required by Rule 58(a)."  Fed. R. Civ. P. 58(d).  Jofaz moves for entry of judgment on the Jofaz Order.  (ECF No.

36; *see* Jofaz's Mem. at 2.)  Specifically, Jofaz requests an order that: (1) enters judgment as to the Jofaz Order pursuant to FRCP 58(d); (2) requires the Old Plan, within seven days of entry of that judgment, to provide an accounting of the Judgment Amount; (3) provides that if the Old Plan does not post a bond under FRCP 62 within thirty days of the judgment, the Old Plan must pay the Judgment Amount within thirty-one days of entry of judgment; (4) provides that if the Old Plan does file a bond in satisfaction of FRCP 62 and the Second Circuit affirms the Jofaz Order, the Old Plan must, within seven days of a final determination or dismissal of the Old Plan's appeal, either (i) pay the Judgment Amount plus accrued interest and costs or (ii) file an accounting stating the amount the Old Plan must pay Jofaz and stating the factual and legal basis for that accounting; and (5) grants such other relief that the Court deems just and proper.  (ECF No. 36.)

While the Old Plan agrees that a judgment should be entered and does not oppose a judgment "that is substantively similar to the judgment in *Mar-Can*," (Old Plan's Opp. at 1; *see id.* at 7),[5] the parties disagree as to whether that judgment should expressly order the Old Plan to return the interim withdrawal liability payments that Jofaz has paid to the Old Plan, (*see id.* at 8-11; Jofaz's Mem. at 1-3; ECF No. 41 ("Jofaz's Reply") at 1, 4-5).  Jofaz contends that the Court's adoption of the *Mar-Can* Decision independently obligates the Old Plan to apply the § 1415(c) reduction to the more than $3 million in assessed withdrawal liability, which results in $0 withdrawal liability as to the Old Plan, and that as a result, the Old Plan must now return the

---

[5] The *Mar-Can* judgment reads:  "It is hereby ORDERED, ADJUDGED AND DECREED:  Judgment is hereby entered for Plaintiff on its claims under 29 U.S.C. § 1415 requiring Defendant to transfer pension assets and liabilities, as set forth in ECF Nos. 184 and 187, and requiring Defendant to reduce Plaintiff's withdrawal liability, as set forth in ECF No. 249."  (No. 20-CV-8743, ECF No. 266.)

withdrawal liability payments because they are considered overpayments, citing to 29 C.F.R. § 4219.31(d).  (Jofaz's Mem. at 1; Jofaz's Reply at 1, 5.)[6]

The Old Plan argues that incorporation of the *Mar-Can* Decision does not require the Old Plan to refund anything, (Old Plan's Opp. at 8), and that there is no independent legal obligation to refund the payments because, under 29 U.S.C. § 1399(c)(2)'s plain language, the payments must continue pending "'any . . . appeal' before an arbitrator or a federal court," (*id.* at 8-9). Moreover, the Old Plan contends that ordering return of the payments would contravene the legislative purpose and history of the Multiemployer Pension Plan Amendments Act ("MPPAA"), (*id.* at 9-11), and that requesting the refund while the Old Plan's appeal of the *Mar-Can* Decision and corresponding judgment is pending may lead to administrative and collection challenges if the Second Circuit ultimately concludes that the Old Plan was entitled to the withdrawal liability payments, (*id.* at 10).

Jofaz responds that § 1399(c)(2), which requires payments to continue during "review and appeal," and the "pay now, dispute later" procedure of ERISA only apply until the later of when the plan review period ends or when an arbitrator issues its decision, citing *T.I.M.E.-DC v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730*, 756 F.2d 939 (2d Cir. 1985).  (*See* Jofaz's Reply at 6-9.)  Moreover, Jofaz argues that because the Court has already decided that § 1415(c) requires the Old Plan to reduce Jofaz's withdrawal liability, unless the Old Plan obtains a stay it

---

[6] In its reply brief, Jofaz requests that the Court enter judgment directing the Fund to return a "withdrawal liability overpayment of $290,380 plus prejudgment interest." (Jofaz's Reply at 4.)  But this figure appears to be the amount associated with the payments of a different employer in the related case *Allied Transit Corp. v. Local 854 Pension Fund*, No. 21-CV-10556 (S.D.N.Y.).  As this seems to be a drafting error that arose in preparing similar motions in both cases, the Court treats Jofaz as requesting the return of the more than $3 million in payments, plus interest.

is required to calculate that reduction and refund the overpayment with interest.  (Jofaz's Reply at 4-6.)

### 1.    ERISA's Statutory Framework

I assume the parties' familiarity with ERISA's statutory framework and the MPPAA, which I discussed at length in the *Mar-Can* Decision, 2024 WL 1250716, at *1-3, *6-8.  I incorporate that discussion here and expand on it as relevant.

As explained in the *Mar-Can* Decision, Part 1 of Subtitle E of ERISA, 29 U.S.C. §§ 1381-1405, governs withdrawal liability, applying "[i]f an employer withdraws from a multiemployer plan."  *See id.* at *7.[7]  It provides a complex scheme for calculating an employer's withdrawal liability.  *See Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196-97 (1997); *Iron Workers Dist. Council of S. Ohio & Vicinity Pension Fund v. Lykins Reinforcing, Inc.*, 484 F. Supp. 3d 544, 548 (S.D. Ohio 2020).  Once an employer withdraws from a pension plan, § 1382 directs the plan sponsor to "(1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability, and (3) collect the amount of the withdrawal liability from the employer."  29 U.S.C. § 1382; *see Bay Area*, 522 U.S. at 197 ("The Act does not call upon the employer to propose the amount of withdrawal liability.  Rather, it places the calculation burden on the plan's trustees."); *T.I.M.E.-DC*, 756 F.2d at 946 ("Once the employer withdraws from the plan, it becomes the plan sponsor's duty to calculate the amount of withdrawal liability.").  After the plan sponsor determines the amount of the employer's withdrawal liability, it must then "(A) notify the employer of (i) the amount of the liability, and (ii) the schedule for liability payments, and (B)

---

[7] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1). "The most significant aspect of the notice scheme is that no matter what disputes arise between the old plan sponsor and the employer over the amount of liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule under § 1399(b)(1)." *T.I.M.E.-DC*, 756 F.2d at 946.

Section 1399(b)(2)(A) provides an informal review process under which the employer may, within ninety days after receiving the notice described in § 1399(b)(1), challenge the plan sponsor's determination of the employer's withdrawal liability and payment schedule. *See Bay Area*, 522 U.S. at 197; *Bowers for & on Behalf of NYSA-ILA Pension Tr. Fund v. Transportes Navieros Ecuadorianos (Transnave)*, 719 F. Supp. 166, 173 (S.D.N.Y. 1989). Once the plan sponsor has conducted a "reasonable review of any matter raised," the sponsor must notify the employer of its decision, its reasoning, and any changes made to the employer's withdrawal liability or schedule of payments. 29 U.S.C. § 1399(b)(2)(B); *see Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, No. 20-CV-9894, 2021 WL 2350094, at *3 (S.D.N.Y. June 8, 2021). Any further disputes "between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of [Title 29] shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1); *see Bay Area*, 522 U.S. at 197 (employer may "invoke a dispute-resolution procedure that involves . . . ultimately, arbitration") (citing 29 U.S.C. § 1401(a)(1)); *T.I.M.E.-DC*, 756 F.2d at 944 ("Section 1401 provides for arbitration to resolve disputes over the amount of the withdrawal liability."). Under § 1401(a)(1), either party may initiate arbitration within sixty days of the earlier of "(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this

title." 29 U.S.C. § 1401(a)(1).  The parties may also jointly initiate arbitration within 180 days

of the plan sponsor's § 1399(b)(1) demand.  *Id.*  If neither party initiates arbitration under

§ 1401(a), then the amount demanded under § 1399(b)(1) must be paid by the employer in

accordance with the payment schedule set by the plan sponsor.  29 U.S.C. § 1401(b)(1).  As far

as the court can discern, neither party initiated arbitration in this case.

The obligation to continue withdrawal liability payments regardless of a dispute as to the

amount or the schedule is set forth in § 1399(c)(2), which reads as follows:  "Withdrawal

liability shall be payable in accordance with the schedule set forth by the plan sponsor under

subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding

any request for review or appeal of determinations of the amount of such liability or of the

schedule."  Section 1401(d) likewise directs:

> Payments shall be made by an employer in accordance with the determinations
> made under this part until the arbitrator issues a final decision with respect to the
> determination submitted for arbitration, with any necessary adjustments in
> subsequent payments for overpayments or underpayments arising out of the
> decision of the arbitrator with respect to the determination.

29 U.S.C. § 1401(d).  These provisions have been characterized as ERISA's "pay now, dispute

later" procedure.  *See Bay Area*, 522 U.S. at 197 ("Even if the employer challenges the trustees'

withdrawal liability determination, however, it still must pay according to the trustees' schedule

in the interim under the statute's 'pay now, dispute later' collection procedure."); *T.I.M.E.-DC*,

756 F.2d at 947 (employer obligated to make payments during "the review and appeal period"

under § 1399(c)(2)); *Iron Workers*, 484 F. Supp. 3d at 549 (ERISA's "pay now, dispute later"

directive established by § 1399(c)(2) and § 1401(d)); *JLNW, Inc. v. Nat'l Ret. Fund*, No. 17-CV-

5095, 2019 WL 4688690, at *4 (S.D.N.Y. Sept. 25, 2019) (to the same effect).  "The 'pay now,

dispute later' [procedure] is intended to address and to alleviate the risk that during the course of

9

arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Bakery & Confectionery*, 2021 WL 2350094, at *3; *see Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, 694 F. Supp. 3d 54, 68 (D.D.C. 2023) (to the same effect).

As detailed in the *Mar-Can* Decision, Part 2 of Subtitle E of ERISA, 29 U.S.C. §§ 1411-1415, governs "merger or transfer of plan assets or liabilities."  2024 WL 1250716, at *7.  When "an employer has completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change of collective bargaining representative," § 1415(a) mandates "that the old plan transfer liabilities and assets to the new plan 'in accordance with [§ 1415].'"  *Id.* at *8 (quoting 29 U.S.C. § 1415(a)).  Section 1415 "requires that notice be given and sets forth procedures for transferring assets and liabilities from the old to the new plan." *T.I.M.E.-DC*, 756 F.2d at 944; *see* 29 U.S.C. § 1415(b), (g).  "Upon completion of a transfer of the appropriate amount of assets and liabilities, Section 1415(c) requires a reduction of the employer's withdrawal liability with respect to the old plan." *Mar-Can*, 2024 WL 1250716, at *8.  Section 1415(c) reads as follows:

> (c) **Reduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan**
> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which–
>> **(1)** the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds
>> **(2)** the value of the assets transferred.

29 U.S.C. § 1415(c).

## 2.    Entry of Judgment

As a preliminary matter, the Old Plan contends that the "primary remaining dispute in this matter is whether and the extent to which [Jofaz's] withdrawal liability to [the Old Plan] should be reduced pursuant to 29 U.S.C. § 1415(c)."  (Old Plan's Opp. at 1; *see id.* at 4.)  While that may be the issue the Old Plan would like to dispute on appeal once judgment is entered, it is no barrier to entry of judgment in this Court, as that dispute has been addressed and resolved in *Mar-Can*, which the Court has applied to this case.  In the *Mar-Can* Decision, I interpreted § 1415 and the surrounding statutory framework, determining how a plan sponsor must apply the § 1415(c) reduction to a withdrawing employer's withdrawal liability with respect to an old plan in connection with a § 1415 transfer.  *See Mar-Can*, 2024 WL 1250716, at *8-15.  I concluded that, for purposes of § 1415(c), "unfunded vested benefits allocable to the employer" means the total amount of unfunded liabilities transferred, *see id.*, at *10-11, and as a result, "under Section 1415(c), to determine the reduction to an employer's withdrawal liability to the old plan, the value of the transferred assets is subtracted from the value of the total transferred liabilities," *id.* at *11.[8]  Thus, the *Mar-Can* Decision decided the question of how to interpret and apply § 1415(c), and by applying that opinion in this case, the Court has resolved the remaining legal dispute between Jofaz and the Old Plan regarding the § 1415(c) reduction in this case.  Assuming, based on Jofaz's representation, that the Old Plan executed the § 1415 transfer of pension assets and liabilities to the New Plan on or about May 19, 2023, (*see* Jofaz's Reply at 9), the remaining task is for the Old Plan to calculate and apply the § 1415(c) reduction to Jofaz's

---

[8]  This calculation usually means that the employer's withdrawal liability is reduced to zero as a result of a § 1415 transfer.  *Mar-Can*, 2024 WL 1250716, at *10-12.

withdrawal liability as to the Old Plan, (*see id.* at 5-6). Once that § 1415(c) reduction is applied, the parties will calculate any overpayments that Jofaz may have made.[9]

The Old Plan's contention that the Jofaz Order does not direct the Old Plan to refund any payments or create an "independent legal obligation" to do so, (Old Plan's Opp. at 8-9), is misplaced. To be sure, the Jofaz Order does not expressly state that Jofaz is entitled to a refund of the withdrawal liability payments demanded by the Old Plan. But the *Mar-Can* Decision and the operation of the relevant statutes and regulations require that result. Under § 1415, once Jofaz and the Old Plan satisfy their notice requirements under § 1415(b), (*see* Compl. ¶ 44-51), the remaining provisions of § 1415 – including the determination of the amount of assets and liabilities to transfer between the plans, and the transfer itself – are triggered, *see T.I.M.E.-DC*, 756 F.2d at 948. Once "the appropriate amount of assets and liabilities under [§ 1415]" are transferred from the Old Plan to the New Plan, § 1415(c)'s plain language directs the Old Plan to apply the statutory reduction to Jofaz's withdrawal liability with respect to the Old Plan. 29 U.S.C. § 1415(c) ("If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability . . . with respect to the old plan *shall be reduced* . . .") (emphasis added). If that results in an assessment of $0 withdrawal liability with respect to the Old Plan, then Jofaz has overpaid.

Regarding withdrawal liability overpayments, 29 C.F.R. § 4219.31(d) states:

_____

[9] While Jofaz represents that "[t]here is no dispute between the parties that applying the [Jofaz] Order to the facts of this case results in [Jofaz] owing $0 in initial withdrawal liability payments to the [Old Plan], (*see* Jofaz's Reply at 1), the Old Plan has not said as much, and the parties have not provided the relevant evidence for me to determine if this is in fact the case. Although reduction to zero is the ordinary outcome, and Jofaz represents that a § 1415 transfer of assets and liabilities has been executed, (*see id.* at 9), the parties have not provided the details of that transfer, and as a result the Court does not know for sure that the § 1415(c) reduction would result in Jofaz's withdrawal liability as to the Old Plan being reduced to $0.

> (d) Overpayments.  If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum. The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer at the same rate as the rate for overdue withdrawal liability payments, as established under § 4219.32 or by the plan pursuant to § 4219.33.

29 C.F.R. § 4219.31(d); *see T.I.M.E.-DC*, 756 F.2d at 947 ("The employer can also put its withdrawal liability into an escrow account, or pay the plan sponsor on time and get back any overpayment with interest.").  The old plan's required calculation of the § 1415(c) post-transfer reduction constitutes a "determin[ation]" by the "plan sponsor" that "payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability," and therefore the plan sponsor is required to "refund the overpayment, with interest, in a lump sum."  29 C.F.R. § 4129.31(d).

Thus, here, under the Jofaz Order the Old Plan is obligated to apply the *Mar-Can* Decision in calculating the reduction that follows the transfer, which in turn drives the calculation of the amount of the overpayment by Jofaz – a "determin[ation]" by the "plan sponsor" requiring it to refund the overpayment (even if that determination results from application of a court decision interpreting § 1415 with which the Old Plan disagrees).

Jofaz's initial assessed withdrawal liability with respect to the Old Plan was $3,147,109. (*See* Compl. ¶ 41; Old Plan's Opp. at 3.)  Assuming that the § 1415(c) reduction reduces that withdrawal liability to $0, any payment that Jofaz made in accordance with the Old Plan's payment schedule is necessarily an "overpayment" and must be refunded, with interest.  *See GCIU-Emp. Ret. Fund v. WestRock Co.*, No. 21-CV-8070, 2023 WL 3402617, at *6 (C.D. Cal. Mar. 10, 2023) ("[T]he court notes that when courts have ordered multiemployer pension plans to remit withdrawal liability overpayments with interest pursuant to 29 C.F.R. § 4219.31(d), the

final *net* withdrawal liability calculation indicated the employer had overpaid.") (emphasis in original) (collecting cases); *Iron Workers*, 484 F. Supp. 3d at 550 ("Along the same lines, even if an arbitrator does not find in the employer's favor, if the employer has over-paid the money it owes, then 'the plan sponsor shall refund the overpayment, with interest, in a lump sum.'") (quoting 29 C.F.R. § 4219.31(d)); *see also Trs. of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 118-19 (7th Cir. 1991) ("[F]unds will be able to repay any withdrawal liability that a court or arbitrator ultimately determines they should not have collected.").

The Old Plan disagrees, contending that § 1399(c)(2)'s plain language "requires continued interim liability payments pending any . . . appeal before an arbitrator or federal court," and thus that it should not have to refund the overpayment until such time (if ever) that its appeal of the Jofaz Order and the corresponding judgment is completed without success.  (Old Plan's Opp. at 8.)  For several reasons, I disagree that that section's reference to "appeal" means appeal to the Court of Appeals (and then the Supreme Court) from a District Court decision.

First, in *T.I.M.E.-DC* the Second Circuit interpreted the terms "review" and "appeal" in § 1399(c)(2) and concluded as follows:

> When [§ 1399(c)(2)] refers to "review" it means the informal review process outlined in § 1399(b)(2)(A) under which the employer, no later than 90 days after it receives the plan sponsor's § 1399(b)(1) notice, may ask the plan sponsor to review the determination to correct any inaccuracy.  Section 1399(b)(2)(B) directs the plan sponsor to respond to the employer's request "after a reasonable review of any matter raised."  The "appeal" refers to the formal arbitration proceedings provided for in § 1401.  ("Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.").

*T.I.M.E.-DC*, 756 F.2d at 946 n.1; *see Greater Pa. Carpenter's Pension Fund v. Novinger's, Inc.*,
No. 14-CV-956, 2015 WL 5691093, at *3 (W.D. Pa. 2015) ("'Appeal' refers to the formal
arbitration proceedings provided for in § 1401.  There is no indication that Congress intended for
review or appeal to apply to a litigant's resort to the federal courts following an arbitrator's final
decision, thus prolonging [the fund's] entitlement to interim withdrawal payments indefinitely.
Such an interpretation would directly conflict with the plain wording of § 1401(d):  '[p]ayments
shall be made by an employer . . . until the *arbitrator* issues a final decision.'") (emphasis in
original).[10]  Here, the dispute involved statutory interpretation of § 1415(c) – a provision outside

---

[10] The Old Plan contends that the Second Circuit's interpretation of § 1399(c)(2)'s scope
is dictum.  (*See* Old Plan's Opp. at 9 n.4.).  I disagree.  In *T.I.M.E.-DC*, the Second Circuit
addressed whether compliance with § 1415's notice and transfer requirements was a condition
precedent to the employer's payment of withdrawal liability.  *See* 756 F.2d at 945.  The Circuit
concluded that ERISA contained no such requirement and that § 1415's transfer provisions did
not alter Congress's aim of requiring interim payments once a plan sponsor issues a
§ 1399(b)(1)(B) demand.  *See id.* at 947 ("Compliance with § 1415 is not . . . a precondition to
the payment of withdrawal liability.").  The Second Circuit interpreted § 1399(c)(2)'s "review or
appeal" language as part of its analysis of the interplay between § 1399, § 1401 and § 1415.  *See
id.* at 945-47.  But even if that discussion were dictum, the Court may still consider it as
indicative of the Second Circuit's view of § 1399(c)(2).  *See United States v. Rare Breed
Triggers, LLC*, 690 F. Supp. 3d 51, 79 (E.D.N.Y. 2023) ("[I]nterpretations of law from an
appellate court . . . even if technically dicta, are entitled to persuasive weight by a district court in
the absence of other, binding interpretations of the same law."); *Kivo v. Blumberg Exelsior, Inc.*,
982 F. Supp. 2d 217, 223-24 (E.D.N.Y. 2013) (judicial dictum "where the Court is providing a
construction of a statute to guide" future courts is "generally entitled to greater weight").

The Old Plan relies on *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 637 F. Supp. 1014
(N.D. Ill. 1986), *aff'd*, 800 F.2d 641 (7th Cir. 1986), which denied an employer's motion to stay
its payment obligation pending appeal by posting a bond pursuant to FRCP 62.  Relying
primarily on the need for the fund to receive a consistent flow of payments, it interpreted
§ 1399(c)(2)'s "pay now, dispute later" command to apply to appeals to courts, not just to an
arbitrator.  *Robbins*, 637 F. Supp. at 1017-18.  As Jofaz points out, (Jofaz's Reply at 11), it is
dubious that this analysis applies when it is the Old Plan that would be posting the bond –
particularly as it is the New Plan that is responsible for the unfunded liabilities associated with
Jofaz's employees.  In any event, this out-of-Circuit case is not binding, and I find its
interpretation unpersuasive for the reasons set forth in the text.

the scope of mandatory arbitration under § 1401(a).  *See T.I.M.E.-DC*, 756 F.2d at 945 ("[T]here

is no indication that Congress contemplated that § 1401(a)(1) would empower an arbitrator to

make decisions outside the context of sections 1381 through 1399.").  "The issue here involves

the interaction of § 1415 with the withdrawal liability provisions and, as such, is outside the

scope of those issues that Congress directed to the arbitrator."  *Id.*; *see Iron Workers*, 484 F.

Supp. 3d at 551 ("[T]he provision requiring arbitration as the exclusive form of dispute

resolution refers only to 'determination[s] made under sections 1381 through 1399 of this

title.'").  Because the interpretation of § 1415(c)'s reduction obligation was not subject to

arbitration under § 1401(a), there is no current "appeal" as contemplated by § 1399(c)(2).  *See*

*T.I.M.E.-DC*, 756 F.2d at 946 n.1.[11]

---

The Old Plan further argues that if *T.I.M.E.-D.C.* is correct that § 1399(c) requires payments only through the conclusion of arbitration, an employer that loses in arbitration could stop paying once the case made its way to federal court.  (Old Plan's Opp. at 9 n.4.)  It is hard to see how that could be the case.  If the employer loses in arbitration, that means that the arbitrator has found that the assessed withdrawal liability and payment schedule are appropriate, and the employer would be obligated to pay, in accordance with the payment schedule and ERISA's statutory framework, *see* 29 U.S.C. §§ 1399(b), 1401(d), until such time as that determination was reversed.  If the arbitrator's ruling were reversed, the fund could post a bond to stay the effectiveness of that order.  And in the event of noncompliance, ERISA provides a pension plan with the ability to accelerate payments or to commence a lawsuit to compel payment.  *See* 29 U.S.C. §§ 1399(c)(5), 1451(b); *see also Bay Area*, 522 U.S. 197-98 (detailing remedies for pension plan if an employer fails to pay according to the demanded payment schedule).

[11] The Old Plan arguably makes this point in its discussion of § 1401(d), which provides that an employer's payments made in accordance with a determination under Part 1 shall continue "until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination."  29 U.S.C. § 1401(d).  There was no arbitration decision regarding the dispute in this case, as the Court addressed it in the first instance, and, as a result, the Old Plan contends that this provision is therefore inapplicable.  (*See* Old Plan's Opp. at 8-9.)  But if § 1401(d) does not apply because there is no arbitration, and under *T.I.M.E.-DC* the term "appeal" in § 1399(c)(2) refers to the arbitration procedures set forth in § 1401, then it follows that there is no "appeal" requiring continued payments by Jofaz.

The Second Circuit's interpretation of the term "appeal" referring to § 1401 arbitration proceedings makes sense when considering the function of § 1399(c)(2) in light of § 1399(b)(1)'s notice requirements.  In *T.I.M.E.-DC*, the Circuit explained that "[t]he most significant aspect of the notice scheme is that no matter what disputes arise between the old plan sponsor and the employer over the amount of [withdrawal] liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule under § 1399(b)(1)."  756 F.2d at 946.  Section 1399(c)(2) clarifies that this obligation of the employer – to "pay now" upon receipt of the pension plan's demand – continues notwithstanding any dispute about the amount of the withdrawal liability or the payment schedule.  *See id.* ("Congress made the requirement that the employer promptly pay its withdrawal liability obligations crystal clear in § 1399(c)(2).").  The Circuit further concluded that the interplay between § 1415 and § 1399 does not alter Congress's aim to require an employer to begin paying withdrawal liability in accordance with a § 1399(b)(1)(B) demand. *See id.* at 947-48.  This makes sense because the *amount* of an employer's withdrawal liability to the old plan is a necessary variable in the calculation of both the "appropriate amount of assets" to transfer under § 1415(g) and the § 1415(c) reduction.  *See* 29 U.S.C. §§ 1415(c) (using the withdrawal liability "determined under section 1381(b)"), (g) (same).  By disputing the amount of assets and liabilities to transfer, the employer or new plan is effectively also disputing the *amount* of the withdrawal liability – precisely what § 1399(c)(2) covers.  In other words, "the fact that the new plan or the employer disputes the amount that the old plan proposes to transfer [under § 1415] does not relieve the employer of its obligation to pay the withdrawal liability according to the payment schedule set by the sponsors of the old plan."  *T.I.M.E.-DC*, 756 F.2d. at 947.

At the same time, § 1415(c)'s reduction is not a determination of the *amount* of withdrawal liability:  it is a separate reduction that occurs in the specific circumstances of a § 1415 transfer that is found in a different part of the MPPAA and is not a dispute falling under § 1399(c)(2)'s review procedures or § 1401(a)'s arbitration procedures.  *See United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs.*, No. 14-CV-183, 2015 WL 778781, at *5 (N.D. Ohio Feb. 24, 2015) (identifying § 1415 as one of ERISA's "specific exceptions that reduce or eliminate withdrawal liability in certain circumstances"), *aff'd*, 812 F.3d 521 (6th Cir. 2016).  *T.I.M.E.-DC* explained that "[o]nce the [Old Plan] provides th[e required] notice, this event will trigger the other provisions of § 1415, and the parties should be able to agree on the amount of assets and liabilities that the old plan should transfer to the new plan.  At the same time, the employer may pursue its arbitration rights under § 1401 if it disputes other aspects of the withdrawal liability calculation."  756 F.2d at 948.  Those "other aspects" refer to the determinations required to calculate the amount of withdrawal liability (or its payment schedule) – in other words, determinations made under Part 1.  Therefore, while § 1415 is not subject to the "pay now, dispute later" procedures of Part 1, it works in tandem and does not interfere with that process.

Next, § 1415(d)'s structure supports this reading.  Where an employer must begin making withdrawal liability payments in accordance with § 1399, and the new plan appeals to the Pension Benefit Guaranty Corporation ("PBGC") to object to the proposed transfer of assets and liabilities, the employer must submit its payments into escrow while that appeal is pending.  *See* 29 U.S.C. § 1415(d).  If the transfer is executed, the funds paid into escrow are returned to the employer; if not, the escrowed amounts are paid to the old plan and credited against the employer's withdrawal liability.  *See id.*  This is logical:  to execute the transfer, there must be a

determined amount of withdrawal liability to calculate the appropriate amount of assets under § 1415(g), and once the transfer occurs, to calculate and apply the § 1415(c) reduction to that withdrawal liability.  If there is a transfer that essentially erases the need for withdrawal liability payments, the funds go back to the employer.  But if there is no transfer, those funds are sent back to the old plan and credited against the employer's withdrawal liability as determined under Part 1.  Importantly, § 1415(d) directs the refund to the employer if the transfer is executed and payment to the old plan with credit toward the employer's withdrawal liability if the transfer is not executed; it does not allow for the funds to remain in escrow pending an appeal to the district court.  Yet accepting the Old Plan's view of § 1399(c)(2) conflicts with § 1415(d)'s plain language.  If the Old Plan's interpretation were correct, there would be no disbursement of any interim withdrawal liability payments until all appeals before federal courts were decided.  It is hard to square that interpretation with § 1415(d)'s command that withdrawal liability payments must be returned to the employer once a § 1415 transfer occurs, if the other conditions of § 1415(d) have been met.  Further, it hardly makes sense that Congress would have wanted the interim payments to be either refunded or applied only where a new plan appeals to the PBGC but not where an employer seeks relief in the district court.

Finally, this interpretation is supported by the statutory purpose behind the "pay now, dispute later" system – that is, "to alleviate the risk that *during the course of arbitration*, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award."  *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 741-42 (6th Cir. 2013) (emphasis added); *see Bakery & Confectionery*, 2021 WL 2350094, at *3 (quoting *Findlay*); *see also ILGWU Nat. Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 881-82 (2d Cir. 1988) ("Moreover, during the pendency of *any arbitration*

*proceedings*, payments must still be made in accordance with the sponsor's determination, with any subsequent adjustments to occur after the arbitrator's final decision.") (emphasis added); *Iron Workers*, 484 F. Supp. 3d at 550 ("It is true the employer must continue making interim payments *until the arbitrator* issues a final decision.") (emphasis added); *cf. Greater Pa. Carpenter's*, 2015 WL 5691093, at *3 ("[A]n interpretation [like the Old Plan proposes] would directly conflict with the plain wording of § 1401(d): 'payments shall be made by an employer until the arbitrator issues a final decision.'"). As there are no pending arbitration proceedings here, and the issue regarding § 1415(c) has been resolved by the Court's final decision in *Mar-Can*, the purposes behind the MPPAA's "pay now, dispute later" procedure have been served. *See Bay Area*, 522 U.S. at 197 (describing "pay now, dispute later" procedure as the dispute resolution that ends with "ultimately, arbitration"). Nothing in the statutes indicates that Congress intended that interim withdrawal liability payments would continue in arbitration only until the arbitrator issues a final decision, but would continue indefinitely if a district court were to issue a final decision instead. That the Court resolved this dispute does not make it any less final. *See* FRCP 62 (unless appealing party posts bond or court orders otherwise, execution and enforcement of a judgment may begin 30 days after its entry); *Harnage v. Santiago*, No. 16-CV-1880, 2017 WL 1005767, at *2 (D. Conn. Mar. 13, 2017) ("Without a specific stay, judgments are effective as soon as they are entered, notwithstanding any appeal that may have been filed."). The Old Plan provides no persuasive authority suggesting otherwise.

Thus, the Old Plan is not entitled to keep Jofaz's withdrawal liability payments. Once the § 1415(c) reduction calculations are complete, the Old Plan is required, by operation of law, to refund overpayments to Jofaz with interest. The Court will enter a judgment saying so.

3.     **Accounting**

Jofaz has requested an accounting within seven days of the judgment.  (*See* Jofaz's Mem. at 3-4; Jofaz's Reply at 2-4.)  While the Old Plan does not oppose an accounting, (*see* Old Plan's Opp. at 7), I agree with the Old Plan that providing an accounting within seven days is not enough time given the lack of clarity regarding the initial withdrawal liability assessment and associated complications with the payments and interest rates that Jofaz has identified, (*see* Jofaz's Mem. at 2-3). [12]  That said, the Old Plan does not persuade me that such accounting should take "a matter of weeks."  (*See* Old Plan's Opp. at 7-8.)  Therefore, I deny Jofaz's request that the Old Plan complete the accounting within seven days of the judgment, and I direct the Old Plan to complete an accounting within fourteen days instead.

**B.     Waiver of FRCP 62 Bond Requirement**

Jofaz anticipates that the Old Plan will move to stay enforcement of the judgment without posting a supersedeas bond and asks the Court to deny that motion.  (*See* Jofaz's Mem. at 5-7; Jofaz's Reply at 11-13.)  The Old Plan argues that this request is premature because FRCP 62 first requires entry of judgment before a party may seek to stay its enforcement, and considering this argument now would be improper under the Federal Rules.  (*See* Old Plan's Opp. at 12-13.) Assuming this Court were to consider the issue, the Old Plan argues that the bond requirement should be waived.  (*See id.* at 13-14.)

---

[12] Jofaz argues that the Old Plan's initial withdrawal liability assessment was unclear, resulting in Jofaz initially paying too much for each quarterly payment.  (*See* Jofaz's Mem. at 3.) As a result, the Old Plan refunded certain payments, did not cash others, and treated some payments as prepayments.  (*See id.*; ECF No. 36-1 ¶ 17.)  Jofaz contends that it needs an accounting from the Old Plan of the exact dates that payments were credited to the Old Plan, as well as the interest rate that applies to those overpayments.  (*See* Jofaz's Mem. at 3.)  But regardless of the exact amounts it paid, Jofaz asserts that its initial withdrawal liability should be reduced to $0 and therefore the Old Plan must refund its withdrawal liability payments as overpayments.  (*See id.*)

"At any time after judgment is entered, a party may obtain a stay by providing a bond or other security."  Fed. R. Civ. P. 62(b).  "The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security."  *Id.*  The purpose of the bond requirement in FRCP 62(b) is twofold:  "to ensure that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed."  *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (*per curiam*).  The Court may exercise its discretion to waive the bond requirement "if the appellant provides an acceptable alternative means of securing the judgment."  *Id.*; *see Sire Spirits, LLC v. Green*, No. 21-CV-7343, 2023 WL 1516574, at *1 (S.D.N.Y. Feb. 3, 2023).  In assessing whether the bond requirement should be waived and "other security" proposed by the appellant accepted, the Second Circuit has identified the following factors:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

*Nassau*, 783 F.3d at 417-18; *see In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, No. 11-CV-1471, 2013 WL 12444540, at *2 (S.D.N.Y. Jan. 29, 2013) (considering similar factors).[13]  The Second Circuit has concluded that these factors, rather than

---

[13]  While there is some conflicting case law regarding whether the Court must first consider the traditional stay factors before determining whether to waive the FRCP 62(b) bond requirement, "there is a more significant and recent body of case law interpreting Rule 62[b] as entitling an appellant to a stay as a matter of right upon posting of a supersedeas bond or upon the court's waiver of the bond requirement where the appeal is taken from a monetary judgment or its equivalent."  *Conte v. Cnty. of Nassau*, No. 06-CV-4746, 2015 WL 13720237, at *2 n.1 (E.D.N.Y. June 4, 2015) (collecting cases).

the traditional stay factors under *Hilton v. Braunskill*, 481 U.S. 770 (1987), "more directly address the primary purpose of Rule 62[b]."[14] *Nassau*, 783 F.3d at 418; *see EMA Fin., LLC v. Joey New York Inc.,* No. 17-CV-9706, 2022 WL 2399754, at *2 (S.D.N.Y. July 1, 2022) ("The traditional four-factor test often used in connection with stays of injunctions . . . applies only when the judgment sought to be stayed is for injunctive or equitable relief."); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 649 (S.D.N.Y. 2018) (traditional four-factor stay test applies "only when the judgment sought to be stayed is for injunctive or equitable relief") (collecting cases).[15]

Based on the language of FRCP 62(b), the Court agrees with the Old Plan that this issue is premature at this stage. It is also not clear to the Court that the parties have fully briefed it. And the Court would like to make the determination on the most up-to-date information. Thus, if the Old Plan desires a stay of enforcement of the judgment pending appeal, it shall so move in the ordinary course. The parties should confer on a briefing schedule and propose it to the Court by letter at the time the motion is filed.

---

[14] "Rule 62(b) was formerly Rule 62(d)." *Georgiev v. Adsad, LLC*, No. 19-CV-122, 2021 WL 3159853, at *1 n.1 (S.D.N.Y. June 21, 2021).

[15] The judgment here is akin to a monetary judgment and not an injunction or for other equitable relief. *See Frommert v. Conkright*, 639 F. Supp. 2d 305, 310 (W.D.N.Y. 2009) (fundamental question in determining whether a judgment is monetary in nature is "whether the monetary value of the judgment can be calculated and secured with relative ease"); *In re Bakery & Confectionery*, 2013 WL 12444540, at *1 (judgment requiring that "defendants calculate and pay benefits to plaintiffs pursuant to the terms of the pension plan . . . to the date of judgment, plus pre-judgment interest" was "monetary in nature")*; cf. Korea Shipping Corp. v. N.Y. Shipping Ass'n*, 811 F.2d 124, 126 (2d Cir. 1987) (finding no appellate jurisdiction because "the district court was not exercising its equity powers when it issued the payment order, but acting instead in accordance with a statute that it believed granted a right to preliminary relief"); *Bowers*, 719 F. Supp. at 171 ("A Court does not draw upon its equitable powers when ordering interim withdrawal liability payments, but merely enforces a statutory right granted to plan sponsors by Congress.").

III.    **CONCLUSION**

For the reasons stated above, Plaintiffs motion for entry of judgment is GRANTED.  The Court will enter judgment in accordance with ECF No. 32 and this decision.  The judgment will direct the Old Plan to transfer pension assets and liabilities pursuant to 29 U.S.C. § 1415 (to the extent it has not already done so), and to calculate the corresponding reduction in Jofaz's withdrawal liability, which by operation of law will require the Old Plan to refund any overpayment.  Plaintiffs' motion is GRANTED in part with respect to its request for an accounting but DENIED as to the request that the accounting occur within seven days of the entry of judgment.  Instead, the Old Plan is directed to provide Plaintiffs, within fourteen days, an accounting of their withdrawal liability overpayments and the calculated interest using the applicable rates.  Plaintiffs' application for a preemptive denial of the Old Plan's application to waive the FRCP 62 bond requirement is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 36, 40).[16]

**SO ORDERED.**

Dated:  August 21, 2024
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[16] ECF No. 40 is a request for oral argument, which the Court finds unnecessary.